# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-KA-01658-SCT

*HENRY CLAY PAYTON*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 9/7/2001 |
| TRIAL JUDGE: | HON. MARCUS D. GORDON |
| COURT FROM WHICH APPEALED: | LEAKE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | IMHOTEP ALKEBU-LAN |
| | CHOKWE LUMUMBA |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: |
| | SCOTT STUART |
| DISTRICT ATTORNEY: | KEN TURNER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED IN PART, REVERSED IN PART AND REMANDED FOR RESENTENCING ON THE CONVICTION OF ARMED ROBBERY-11/06/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Henry Clay Payton (Payton) was convicted in the Circuit Court of Leake County of armed robbery and arson and sentenced to serve consecutive terms of thirty-eight years for armed robbery and ten years for arson. Aggrieved by his conviction and sentence, Payton appeals, in forma pauperis, presenting the following issues, edited for clarity, for the Court's resolution:

I. **WHETHER PAYTON WAS DENIED A FAIR TRIAL BECAUSE HE WAS BROUGHT INTO THE COURTROOM WHERE THE JURY WAS SEATED WEARING SHACKLES AND CHAINS.**

II. **WHETHER THE TRIAL COURT ERRED IN PERMITTING THE INTRODUCTION OF PAYTON'S STATEMENT WHEN HE HAD BEEN DENIED HIS *MIRANDA* WARNINGS.**

III. **WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DENIED PAYTON'S MOTION FOR A DIRECTED VERDICT OR IN THE ALTERNATIVE A MISTRIAL.**

IV. **WHETHER TRIAL JUDGE COMMITTED REVERSIBLE ERROR BY REFUSING TO RECUSE HIMSELF.[1]**

    a. **Whether the evidence showed that the judge had an interest in the case.**

    b. **Whether the trial judge harbored animosity toward Payton's counsel and was no longer impartial.**

    c. **Whether the trial judge improperly enhanced Payton's sentence because he continued to assert his innocence and because the court was vindictive.**

    d. **Whether the trial court erred in sentencing Payton to a term of years that is not reasonably expected to be less than his life expectancy.**

    e. **Whether the trial judge committed reversible error in overruling Payton's motion of recusal on post-conviction motions.**

V. **WHETHER THE COURT ERRED IN NOT HEARING TESTIMONY FROM JURORS WHO PROVIDED AFFIDAVITS ABOUT MATTERS OUTSIDE JURY DELIBERATION THAT AFFECTED THEIR VERDICT.**

**FACTS AND PROCEDURAL HISTORY**

---

[1]In this assignment, we have combined five of Payton's issues because they all deal with the general issue of whether the trial judge should have recused himself.

¶2.      On September 29, 1995 in Leake County a commercial building was completely burned, the Bank of Walnut Grove was robbed, and the bank president, Ray Britt, was taken hostage. Investigation and testimony at trial revealed that four men were involved in this series of events - Cleon Graves, Cornelius Belmer, Dedrick Marshall, and the appellant, Henry Clay Payton. According to his accomplices, Payton was the mastermind behind the crimes. They each testified that it was Payton's idea to burn the building in order to divert attention from the bank and then to have them rob the bank at gunpoint while Payton waited outside in the getaway car. Payton also allegedly suggested that, if something should go wrong in the bank, the men should take a hostage.

¶3.      Graves, Belmer, and Marshall then robbed the bank. When they got the money and were ready to leave, they looked outside for Payton. They realized that Payton had abandoned them and remembered Payton's advice to take a hostage. They decided on Ray Britt, the bank president, so they took Britt and his car and fled the bank, with Britt driving at gunpoint. Heavily pursued by law enforcement officials, the men forced Britt to drive south to Interstate 20 and then west toward Jackson. According to Britt, the three men continually cursed Henry Payton during the high speed chase for leaving them at the bank. The vehicle went through a roadblock in Forest, and according to Officer Joe Nelson, there was a shot fired from the window of the car at Nelson's patrol vehicle. Unable to stop the men, Nelson radioed two semi-trucks on the interstate via C.B. and asked them for help in apprehending the men. The trucks slowed down and rode side-by-side to prevent the men from passing. When the men were unable to pass the trucks, they ordered Britt to exit the interstate at Morton. Britt then grabbed the gun that had been pointed at him throughout the chase and ran the car into a

concrete traffic island. Finally, the car came to a stop, the police closed in, the three men were arrested, and Britt was freed. After learning of Payton's involvement in the crimes, law enforcement officials located and arrested him and charged him with armed robbery, kidnapping, and arson in the second degree. Payton was tried and found guilty as charged. The jury recommended a life sentence for both the armed robbery and kidnaping. Payton was so sentenced, and said life sentences were imposed consecutively in addition to five years for the arson charge. Aggrieved by his conviction and sentence, Payton appealed. The Court of Appeals affirmed the conviction, and we granted certiorari to review the Court of Appeals' judgment.

¶4. This Court found error in the trial court's refusal to sever Payton's trial from that of a co-defendant, and in the prosecutor's use of the improper "send a message" argument during closing argument. *Payton v. State*, 785 So.2d 267 (Miss. 1999). The case was remanded, and on September 7, 2001, Payton was again convicted of armed robbery and arson. He was acquitted on the kidnaping charge. The court sentenced Payton to serve thirty-eight years for armed robbery and ten years for arson, with the terms to run consecutively. Payton filed a timely notice of appeal.

¶5. Finding no reversible error in Payton's convictions, we affirm his convictions and reverse and remand for resentencing on the armed robbery conviction.

**ANALYSIS**

I.     **WHETHER PAYTON WAS DENIED A FAIR TRIAL BECAUSE HE WAS BROUGHT INTO THE COURTROOM WHERE THE JURY WAS SEATED WEARING SHACKLES AND CHAINS.**

4

¶6.     Payton claims he was denied a fair and impartial trial because he was brought before the jury wearing cuffs around his ankles and his waist. He argues the prejudice was so great that a continuance and a new jury were the only sufficient remedies. Payton concludes that the trial judge's failure to grant these remedies denied him a fair trial.

¶7.     The record indicates that Payton was brought into the courtroom, in the presence of the jury pool at 9:20 a.m. There was a chain around his waist and cuffs on his ankles. After preliminary matters, constituting 21 lines of transcript, the court granted Payton and his counsel a conference. Court resumed at 10:02 a.m., with the jury pool excused. Payton informed the trial judge of the restraints and requested a continuance and a new jury pool.

¶8.     The trial judge stated that he did not notice the restraints when Payton entered the courtroom. The judge took notice that the jury was seated approximately twenty-five feet from Payton and that their view would have been obstructed by the rail, the lectern, the counsel table, and by the attorneys seated at the table. The judge said he had no way of knowing if the jury saw the restraints. Payton claims that the judge was distracted when Payton entered the courtroom and argues that his investigator, Ervin Bradley, seated in the back of the courtroom, clearly observed the restraints.

¶9.     Payton was granted additional time during voir dire to question the jurors on this point. The judge told Payton he would rule on any prejudice at that time, but denied his motion for a continuance. The trial judge ordered the restraints removed.

¶10.    Payton did not ask the potential jurors whether they noticed the restraints. He argued that he forgot because he was not given sufficient time for voir dire. Payton again moved for

5

a continuance and/or a new venire. The trial judge denied these requests, finding that Payton improperly utilized the adequate time he was allowed by inquiring into irrelevant matters.

¶11. The standard of review to grant or deny a motion for continuance is within the sound discretion of the trial court and will not be grounds for reversal unless shown to have resulted in manifest injustice. *Coleman v. State*, 697 So.2d 777, 780 (Miss. 1997). Also, the decision to quash the venire is a matter likewise entrusted to the sound discretion of the trial court. *Kolberg v. State*, 829 So.2d 29, 83 (Miss. 2002). "Where ... the evidence is conflicting on the question of whether or not the defendant could receive a fair and impartial trial, this Court will generally defer to the considered opinion of the trial judge." *Burrell v. State*, 613 So.2d 1186, 1190 (Miss. 1993).

¶12. Restraints should be used only in exceptional cases where there is evident danger of escape or in order to protect others from an attack by the prisoner. *Rush v. State*, 301 So. 2d 297, 300 (Miss. 1974). Permitting the jury to see the defendant bound and shackled improperly encroaches on the defendant's presumption of innocence. *Hickson v. State*, 472 So. 2d 379, 383 (Miss. 1985). If this right of the accused is violated, it may be ground for the reversal of conviction. *Rush*, 301 So. 2d at 300. However, the failure, through an oversight, to remove handcuffs from a prisoner for a short time or any technical violation of the rule prohibiting shackling, not prejudicial to him, is not ground for reversal. *Id.*

¶13. In *Hickson*, the defendant was brought into the courtroom in handcuffs. He sat, so restrained, in view of the unselected jurors between thirty minutes and an hour. He was then led out of the courtroom to have the handcuffs removed. Though *Hickson* was reversed on

6

other grounds, this Court found that this level of juror observation improperly eroded the presumption of innocence to which the defendant was entitled. This Court ordered that Hickson's rights be respected on remand. *Hickson*, 472 So.2d at 382-83.

¶14. In *Rush*, the deputy sheriff brought the defendant into the courtroom in handcuffs in the presence of members of the special venire. The handcuffs were immediately removed at the request of defendant's counsel. Finding no prejudice to the accused, this Court held the technical violation of the rule against shackling to be harmless error. *Rush*, 301 So.2d at 300.

¶15. Unlike the defendants in *Hickson* and *Rush*, Payton's hands were not restrained. He had a chain around his waist and cuffs on his ankles. He was seated at his attorney's table, and it is probable that the restraints were thus hidden from the view of the potential jurors. Soon after being brought to the court's attention, Payton's restraints were removed outside the presence of the jury.

¶16. This Court has routinely upheld the trial court's refusal to grant a mistrial even in cases where the record affirmatively shows that jurors actually saw the defendant in restraints. *See, e.g.*, *Brown v. State*, 690 So. 2d 276, 287 (Miss. 1996) (defendant restrained because of safety concerns); *Davenport v. State*, 662 So.2d 629 (Miss. 1995); *Wiley v. State*, 582 So.2d 1008 (Miss. 1991). In addition, without a showing of prejudice, this Court has generally been unwilling to reverse a conviction on these grounds. *See Lockett v. State*, 517 So. 2d 1317, 1329 (Miss. 1987) (defendant brought into courtroom with handcuffs on his wrists and

ankles); *Hickson v. State*, 472 So. 2d at 383 (defendant was handcuffed in the presence of the jury for between thirty minutes and an hour).

¶17.    This case is more akin to the non-prejudicial technical violation found in *Rush* than it is to the more egregious violation found in *Hickson*.  The record reveals that Payton was restrained in the venire's presence for only a short time and his restraints were removed, outside the presence of the jury, as soon as being brought to the court's attention. Moreover, Payton has presented no evidence which indicates that the jurors were not fair and impartial. He has presented no objective evidence that any of the potential jurors even saw the restraints.[2] In his last assignment of error, Payton presents affidavits from jurors regarding outside influences that affected their verdict, notably absent from these affidavits is any evidence that jurors saw the restraints or that they were influenced by them in any way.

¶18.    Payton argues that "there is a strong presumption, not rebutted by the State, that Payton was prejudiced by being seen brought into the courtroom in chains."  He cites no authority for this proposition and this Court has found none.  There is, however, a presumption that the judgment of the trial court is correct, and the burden is on the appellant to demonstrate some reversible error to this Court.  *Branch v. State*, 347 So.2d 957, 958 (Miss. 1977).  Payton has failed to meet this burden.

---

[2]Payton presented only the statement of his own investigator who testified that, from his seat in the back of the courtroom, he could clearly see the restraints. This testimony is insufficient to demonstrate an abuse of discretion.

¶19.   Payton also complains that the time allotted for voir dire was inadequate[3] and that he was denied the right to voir dire the panel individually.

¶20.   Trial judges are given considerable latitude in determining the time to be allowed for matters such as opening statement and voir dire. *See **Herrington v. Spell***, 692 So.2d 93, 102 (Miss.1997).   This discretion is granted via URCCC 3.05 which provides that voir dire examination of jurors shall be directed to the entire venire with questions addressed to individual members only upon good cause and so as to inquire into juror answers.  This practice has been upheld by our case law. *See **Speagle v. State***, 390 So.2d 990 (Miss. 1980); ***Gray v. State***, 375 So.2d 994 (Miss. 1979); ***Peters v. State***, 314 So.2d 724 (Miss. 1975).  Payton has not demonstrated why individual voir dire was necessary or how it would have affected the outcome of the trial.

¶21.   Limiting Payton's counsel to forty minutes was not an abuse of discretion. *See **Beckham v. State***, 735 So.2d 1059, 1063 (Miss. Ct. App. 1999) (affirming both sides were limited to 15 minutes per side and defense counsel was granted two extensions).  The undeveloped record is Payton's own fault for failing to inquire as to whether any jurors noticed the restraints.  Precedent dictates that the mere sight of a restrained defendant by actual or potential jurors does not require a mistrial. Although permitting the jury to see the defendant bound encroaches upon his presumption of innocence, it is insufficient without demonstrable prejudice to warrant reversal.  Payton did not prove that the jury saw him in chains, and he has failed to do more than assert that he was prejudiced.  That is not enough.

---

[3]Payton also argues that the time allotted for opening and closing statements was inadequate.

¶22. This assignment is without merit.

## II. WHETHER THE TRIAL COURT ERRED IN PERMITTING THE INTRODUCTION OF PAYTON'S STATEMENT BECAUSE PAYTON WAS DENIED HIS *MIRANDA* WARNINGS.

¶23. Over Payton's objection and outside the presence of the jury, the State presented testimony from law enforcement officers regarding two statements allegedly made by Payton. The officers testified that Payton told them he was with his girlfriend in Belzoni on the day of the robbery. The statements were not written or signed by Payton, nor were they tape recorded. Payton argues that the State failed to prove the statements were freely and voluntarily given.

¶24. FBI Agent Floyd Plummer (Plummer) testified that he and Jackson Police Department, Chief James French (French), interviewed Payton the day of the robbery. Plummer testified that he advised Payton of his *Miranda* warnings and that Payton understood and waived them. Plummer testified that no one threatened Payton, used force or violence, or offered promises of rewards or leniency, and that Payton did not appear to be under the influence of drugs or alcohol. He said Payton did not ask for an attorney or to have the questioning cease. Plummer testified that Payton told them that "in the early morning hours of [the day of the robbery], he had traveled with his girlfriend, Beverly Beard, to Belzoni and that he had remained with her in Belzoni virtually all day." This testimony was confirmed by French.

¶25. Conversely, Payton testified that he was not advised of his *Miranda* rights, was not offered an opportunity to sign that he understood his rights or to see a rights form, and that his requests for an attorney were ignored. Payton testified that he only told the officers that he had been with his girlfriend that morning and that evening.

¶26. The trial judge ruled that the testimony would be admissible, finding the officers' testimony to be more credible than Payton's. He reasoned that the statement was admitted in rebuttal to Payton's evidence that he had been in both Midway and Lena, Mississippi, on the day of the robbery inquiring about purchasing a car.[4] This testimony was in conflict with what Payton had allegedly told officers about being in Belzoni with his girlfriend the day of the robbery. The judge noted that Payton admitted that he made some statements to officers about being with his girlfriend both the morning and evening of the robbery, but that he disagreed as to exactly what was said.

¶27. Tim Palmer, Town Marshall of Walnut Grove, testified that he and Deputy Marshall Ricky Lewis traveled to Jackson to take custody of Payton. Palmer testified that he advised Payton of his *Miranda* rights, but asked him no questions. Palmer testified that no one threatened Payton, used force or violence, or offered promises of rewards or leniency, and that Payton did not appear to be under the influence of drugs or alcohol. Palmer said Payton did not request an attorney at that time. He testified that Payton volunteered the information that he was with his girlfriend in Belzoni all day and that he had returned home just before he was

---

[4]Milton Jerome Banks testified that, on the day of the robbery, Payton drove up to his house sometime between 11:00 - 12:00 and inquired about a car for sale. He testified that Payton asked for directions to Lena, Mississippi, then left, after being there approximately 5 minutes. Banks testified that it is about 25 minutes from the bank in Walnut Grove to his home and about ten minutes from his home to Lena.

Joseph W. Langford testified that, on the day of the robbery, Payton drove up to his home. It was about 1:00 or 1:30 p.m. (the bank was robbed about 11:45 a.m.). Langford testified that Payton talked to him about buying an antique car that was under a nearby barn; that it takes between fifteen and twenty minutes to drive from the bank to his place; that he got Payton's name and telephone number. He testified that Payton told him that he had heard about the car and had been driving the roads for about twenty or thirty minutes looking for it. On cross-examination, however, he admitted that he testified in the first trial that Payton did not make a statement that he had been looking for his house for thirty minutes. Langford testified that Payton stayed there between fifteen and twenty minutes.

11

arrested. Payton denied that he told Palmer and Lewis anything but conceded that his *Miranda* rights were explained to him by Palmer.

¶28.     The trial judge admitted the officers' testimony regarding this statement, finding that it "was a spontaneous statement that was made by the Defendant, not subject to custodial interrogation as required by the case of *Miranda*." The trial judge stated that while the best procedure may be to have the defendant waive his rights in writing, this is not an absolute requirement. He reasoned that "it is not unusual for the testimony of one witness to be pitted against the testimony of another. Then the jury, as the trier of the facts, will decide who is telling the truth."

¶29.     This Court will reverse the trial court's finding that a confession is admissible only when an incorrect legal standard was applied, manifest error was committed, or the decision is contrary to the overwhelming weight of the evidence. *Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994). "Once the trial judge has determined, at a preliminary hearing, that a confession is admissible, the defendant/appellant has a heavy burden in attempting to reverse that decision on appeal." *Applewhite v. State*, 753 So. 2d 1039, 1041 (Miss. 2000).

¶30.     The prosecution has the burden of proving beyond a reasonable doubt that the confession was voluntary. The State meets its burden and makes a prima facie case when an officer or other person who has knowledge of the facts testifies that the confession was made voluntarily, without threats, coercion, or offer of reward. *Dancer v. State*, 721 So. 2d 583, 587 (Miss. 1998) (citing *Morgan v. State*, 681 So. 2d 82, 86-87 (Miss. 1996)).

¶31.     In the case at bar, the State presented several officers who testified that no promises were made to Payton and that he was not forced to speak. These officers testified that Payton

was given *Miranda* warnings, which he knowingly and voluntarily waived. Thus, based on *Dancer* and *Morgan*, this Court concludes that the trial judge committed no error in refusing to suppress these statements.

¶32. The limits of this Court's review on the admissibility of a confession were described in *Alexander v. State*, 610 So.2d 320 (Miss. 1992), as follows: "This is essentially a fact-finding function. So long as the court applies the correct legal standards, 'we will not overturn a finding of fact made by a trial judge unless it be clearly erroneous [or contrary to the overwhelming weight of the evidence].'" *Id.* at 326 (citations omitted). Where, on conflicting evidence, the lower court admits a statement into evidence this Court generally must affirm. *McGowan v. State*, 706 So.2d 231, 235 (Miss. 1997); *Morgan*, 681 So.2d at 87 (citing *Alexander*, 610 So.2d at 326). Whether there was an intelligent, knowing and voluntary waiver is essentially a factual inquiry to be determined by the trial judge from the totality of the circumstances. *McGowan*, 706 So.2d at 235.

¶33. The trial judge's determination on the admissibility of this testimony was not erroneous. It was based on the totality of the circumstances and involved weighing the credibility of Payton's testimony versus that of distinguished officers. This manner of determining admissibility is proper for the trial judge when sitting as the trier of fact. *See* *McGowan v. State*, 706 So. 2d at 235; *Morgan*, 681 So. 2d at 87.

¶34. Additionally, the admission of an involuntary confession is subject to harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 306-12, 111 S. Ct. 1246, 113 L. Ed.2d 302 (1991). Payton has failed to demonstrate that admitting the statement was prejudicial to his

13

case. He argues only that "[i]t is obvious Payton was prejudiced by the introduction of the alleged statement. He did not present witness to corroborate he was in Belzoni with his girlfriend that day." Beyond this assertion, Payton offers no proof that he was prejudiced. There is a presumption that the judgment of the trial court is correct, and the burden is on the appellant to demonstrate some reversible error to this Court. *Pate v. State*, 419 So.2d 1324, 1325-26 (Miss. 1982); *Branch v. State*, 347 So.2d 957, 958 (Miss. 1977). Payton has failed to meet that burden. Therefore, the admission of his statements, if erroneous, was harmless in light of Payton's impecunious argument.

¶35. This assignment is without merit.

### III. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DENIED PAYTON'S MOTION FOR A DIRECTED VERDICT OR IN THE ALTERNATIVE A MISTRIAL.

¶36. Next, Payton argues that the trial judge erred by denying his motion for a directed verdict. Payton argues that, with the exception of the unreliable testimony of his three co-defendants, insufficient evidence was presented to establish that he participated or was observed participating in the bank robbery. In response, the State points out that the testimony of accomplices alone can be sufficient evidence to support a conviction. Additionally, it asserts that the co-defendants' testimony was corroborated by substantial evidence. We agree.

¶37. The well-established standard of review for a challenge to the sufficiency of the evidence is as follows:

> When on appeal one convicted of a criminal offense challenges the legal sufficiency of the evidence, our authority to interfere with the jury's verdict is quite limited. We proceed by considering all of the evidence--not just that supporting the case for the prosecution--in the light most consistent with the verdict. We give the prosecution the benefit of all favorable inferences that may

14

reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not have found beyond a reasonable doubt that he was guilty, reversal and discharge are required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fairminded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb.

*Turner v. State*, 818 So.2d 1181, 1184 (Miss. 2002).

¶38.    The general rule in Mississippi is that the uncorroborated testimony of an accomplice or a co-conspirator may be sufficient to sustain a conviction. *Doby v. State*, 532 So.2d 584, 591 (Miss. 1988); *Ragland v. State*, 403 So.2d 146, 147 (Miss. 1981); *Jones v. State*, 381 So.2d 983 (Miss. 1980); *Lifer v. State*, 189 Miss. 754, 199 So. 107 (1940).  The general rule is inapplicable in those cases where the testimony is unreasonable, self-contradictory, or substantially impeached. *Flanagan v. State*, 605 So. 2d 753, 758 (Miss. 1992).

¶39.    In *Flanagan*, the only evidence presented against the defendant was the testimony of alleged co-conspirators which was found to be conflicting, self-serving and unworthy of belief. Conversely, the defense in that case presented credible evidence of innocence. *Id.* at 758.

¶40.    In the case at bar, Payton presented little credible evidence of innocence.  Conversely, all three co-defendants testified that Payton planned and participated in the robbery and arson, and their testimony was consistent with statements they gave after being arrested.  Payton insinuated that the co-defendants' schemed against him in order to help themselves; however, testimony at trial established that his co-defendants were kept separated and could not have conspired together on a similar story.

¶41.    In *Williams v. State*, 427 So.2d 100 (Miss. 1983), this Court held:

> We have stated many times that the jurors may accept the testimony of some witnesses and refuse that of others and they may accept in part and reject in part the evidence on behalf of the State and on behalf of the accused. ... It is not for this Court to pass upon the credibility of witnesses and where the evidence justifies the verdict it must be accepted as having been found worthy of belief. ...

*Id.* at 104 (emphasis added). The testimony of the three co-defendants in the case at bar was not so incredible that reasonable and fair-minded jurors could not have accepted it. Payton does not demonstrate, or even argue, that his co-defendants' testimony was unreasonable, self-contradictory, or substantially impeached. Thus, under *Flanagan*, and the deference that must be afforded the jury's verdict, their testimony alone was sufficient to support the ruling denying Payton's motion for a directed verdict.

¶42.   However, unlike *Flanagan*, the testimony of the co-defendants in the case at bar did not stand alone. Where there is slight corroborative evidence, the accomplice's testimony is sufficient to sustain the verdict. *Brown v. State*, 682 So. 2d 340, 345 (Miss. 1996). Substantial corroborative evidence, outlined below, was presented that established Payton's involvement in these crimes and adequately supported the jury's verdict.

*Testimony of Eric Freeman*

¶43.   Eric Freeman, an inmate incarcerated with Payton on unrelated charges, testified that he and Payton were in the same cell block and went to recreation together. Freeman testified that during these recreation times, Payton bragged about the crimes, telling Freeman the following: Payton planned and participated in the robbery; his three accomplices were easy for him to influence as long as he gave them something to drink and something to smoke; Payton's accomplices did not know their way back to Jackson, so he did not have to worry about them

16

leaving him; Payton told Freeman that they set a fire in order to draw the police away while they robbed the bank; Payton told him that he left the bank because his accomplices took too long and "messed up his good plan"; Payton told him about his attempts at fabricating an alibi through his girlfriend and by pretending to be interested in buying a car; and Payton told him that he had an inside source at the bank (a security person) who would testify he was not there. Freeman also testified that Payton told him to go to Payton's accomplices and tell them to change their statements to exonerate Payton and he would help them, but if they did not change their statements, Payton could not help them.

¶44.   Payton presented evidence establishing that the jail where he was housed had implemented a policy within the last three weeks forbidding inmates going to recreation together.  He argues Freeman testified that the conversation with Payton occurred within the previous three weeks, thus, he concludes that Freeman's testimony "was unreasonable, self-contradictory and substantially impeached by the testimony of Lieutenant Howard Ragsdale who testified Freeman and Payton were never together in the jail."

¶45.   However, Lt. Ragsdale testified that Payton and Freeman *were* alone together in the jail. During the State's examination of Lt. Ragsdale, the following dialog occurred:

> Q.   All right.  While working in your capacity as a lieutenant at the Leake County Correctional Facility, has the Defendant, Henry Payton, and also another inmate by the name of Eric Freeman been incarcerated there?
> A.   Yes, sir.
> Q.   And, I will ask whether or not at some point in time, somewhere around a month or so prior to this, they were both in lock-down?
> A.   Yes, sir.
> Q.   All right.  Now, while they were in lock-down, *were they ever allowed by you to go out in the recreational area together?*
> A.   *Yes, sir,* we did.

Q. All right. Can you tell me whether or not there would be anybody else out there with them?

A. No. *At the time they was out there, they was out there by themselves.*

(emphasis added).

¶46. During Payton's cross-examination of Freeman, *Payton's counsel* repeatedly stated that the conversation with Payton occurred sometime in the previous three weeks. Payton argues that Freeman confirmed this time frame. However, after reviewing Freeman's testimony, we do not come to the same conclusion. Freeman's testimony was that the conversation occurred within the last month. Lt. Ragsdale testified that at one point Freeman and Payton were allowed to go into the yard together. It was Payton's counsel, not Freeman, who asserted that the conversation occurred within the last three weeks. That being the case, the credibility of Freeman's and Lt. Ragsdale's testimony were matters properly before the jury and deserving of the weight apparently assigned to them.[5]

¶47. Payton argues that Freeman's testimony required corroboration. Apparently, Payton confuses the corroboration required for questionable co-conspirator testimony with that of a disinterested witness. *See Flanagan v. State*, 605 So. 2d at 758. The only requirements for the admissibility of a disinterested witness' testimony is that the witness be competent and speak from personal knowledge, and that the testimony be relevant. *See* M.R.E. 601 & 602. Freeman's testimony established that he spoke from personal knowledge. Beyond unsupported inferences that Freeman was being coerced to testify, an allegation that was denied by

---

[5]Additionally, Payton argued that Freeman could not testify because his identity or the substance of his testimony had not been timely disclosed to the defense and because Payton's motion for a continuance was denied.

18

Freeman, Payton has presented no evidence establishing that Freeman's testimony was so incredible as to require corroboration or to warrant suppression.

*Testimony of Corey Young*

¶48.    Corey Young testified that he was present when Payton, Marshall, Belmer, and Graves planned the robbery. According to Young, Payton led the discussion. Young testified that Payton claimed to have an inside source at the bank who provided him with information. Payton asked him to be their driver on the day of the robbery. Young told Payton that he would get back to him, but he never did.

¶49.    On cross-examination, Payton brought out that Young was a friend of Dedrick Marshall, one of Payton's co-defendants, and that he testified on Marshall's behalf in his trial. Payton also insinuated that Young might have stolen Payton's car and been the unidentified fourth robber in the BMW. He offered no corroboration of this allegation. Other than these attempts at demonstrating bias and interest, Payton did nothing at trial or in brief to this Court to discredit Young's testimony,

*Testimony of McArthur Hill*

¶50.    McArthur Hill, another inmate incarcerated with Payton on an unrelated charge, testified that Payton asked him to deliver a letter to co-defendant Marshall and that Payton told him to tell Marshall "that he didn't leave them, that he was where he was supposed to be, that they missed their turn." The alleged letter was not introduced. On cross-examination, Payton's counsel pointed out that Hill did not know to what occasion this message referred.

*Testimony of Bank Employees*

¶51. The president of the bank, Ray Britt, testified that during the robbery, one of the robbers stated that "Henry has left us and he's taken the car." Britt was taken hostage. He testified that during the police chase, the robbers cursed "Henry" many times for leaving them. Payton's first name is Henry.

¶52. Vice-president Carl Ware testified that during the robbery, the robbers "were saying 'He's gone, the MF is gone.' Ware testified that they were asking one another where was the car, and one of them responded, 'The car is not coming back.'" Ware testified on cross-examination that he heard the statements clearly and had repeated them word for word. Payton pointed out that Ware did not hear the robbers use the name "Henry" name as had Britt; insinuating that name had not been used. However, on re-direct, Ware testified that he was on the other end of the bank from Britt, and that he could not hear everything the robbers said because they were moving around the bank and because he was nervous.

*Testimony of Jeannie Seamer*

¶53. Jeannie Seamer, a citizen nearby, testified that she saw four black males in a silver-gray BMW park in front of the bank. Later, she saw three of them at the bank door and one remaining in the driver's seat of the BMW. She noticed that the three men at the bank door had ski masks on their heads and guns in their hands. She then went to the police station and told them that the bank was being robbed. Seamer testified that when the police sirens started going off, the man in the BMW drove away by himself. The bank's vice-president, Carl Ware, testified that he also saw a gray BMW outside the bank prior to the robbery.

¶54. Testimony at trial established that Payton had access to, and occasionally drove, a gray BMW matching the description given by Seamer and Ware. Although the car was registered

20

to someone else, Payton had previously filed a claim with his insurance company when the car had been in an accident. He listed himself as the owner. The BMW was destroyed by an intentional fire soon after the bank robbery.

¶55. Seamer testified that she recognized Payton as the driver of the robber's car when she saw him at the first trial, but his looks had changed since then to the extent that she could not identify him at the second trial. Seamer testified that no one asked her to identify Payton at the first trial. She said that had she been asked to identify him at that time, she would have been able to. She testified that if Payton was the same man that was at the first trial, then he was the man she saw in the BMW.

¶56. On cross-examination, referring to Payton's first trial, Payton questioned Seamer as follows:

> Q. Then you were asked if you know the gentlemen here, pointing to Mr. Payton; right?
> A. Right.
> Q. So, you must have been focused on him, because they pointed to him; right?
> A. Right.
> Q. And, you said, "No, sir, I sure don't," and then you were asked, "You can't say he was there at all; can you?" And, your answer was, "No, sir."
> A. "No, sir." [6 ]

Therefore, Seamer's testimony was called into question.

¶57. "When evidence is in conflict, the jury is the sole judge of both the credibility of a witness and the weight of his testimony." *Weathersby Chevrolet Co. v. Redd Pest Control Co.*, 778 So. 2d 130, 133 (Miss. 2001). The jury is charged with listening to and reviewing

---

[6]Although Seamer answered "No, sir", apparently she meant to confirm, rather than dispute that had in fact been her testimony. Defense counsel had no further questions and another portion of the cross-examination asked her the same question, and she confirmed it there. .

conflicting testimony and witness credibility, and deciding whom to believe. *Wetz v. State*, 503 So.2d 803, 807 (Miss. 1987).

¶58. Seamer's testimony, was not so incredible as to be unworthy of submission to the jury or of acceptance by them. Other testimony confirmed her description of the BMW and everything else she testified to, save her testimony that she could have identified Payton at the first trial. Seamer's testimony, combined with the other evidence produced by the State, could constitute the "slight corroborative evidence" of the accomplices' testimony sufficient to sustain the verdict. *See Brown v. State*, 682 So. 2d at 345.

¶59. On the issue of legal sufficiency, this Court held in *Pinkney v. State*, 538 So.2d 329, 353 (Miss. 1988), that reversal can only occur when evidence of one or more of the elements of the charged offense is such that reasonable and fair minded jurors could only find the accused not guilty. The testimony of Payton's three co-defendants was reasonable and not substantially impeached. It was corroborated by numerous other witnesses who testified to Payton's involvement in these crimes, and he was linked to the crimes through credible evidence. Although Payton's counsel did his best to discredit and confuse these witnesses, their testimony was not so incredible or unreliable that a reasonable and fair-minded jury could not have believed it. Given the deference that must be afforded to the jury's verdict when it finds support in the evidence, we conclude that the trial judge did not abuse his discretion in refusing to set aside the verdict for lack of evidence.[7]

---

[7]Payton also restates in this assignment his argument that he was denied a fair trial by being brought into the courtroom in shackles and chains. He argues this was grounds for a directed verdict. We disagree for the reasons previously stated.

*Allegations of discovery violation necessitating directed verdict* [8]

¶60.    Lastly, Payton argues that the trial judge erred by failing to grant a continuance after Freeman's testimony. Payton claims this testimony was crucial because it was the State's only corroborating evidence supporting the testimony of his co-defendants.

¶61.    The prosecutor claimed he disclosed that Freeman would testify Thursday, August 30, 2001, the same day he learned of Freeman. Payton claims he was not advised of Freeman until Friday, August 31, 2001. Payton attempted to speak with Freeman that day, but Freeman refused. The trial began on Tuesday, September 4, 2001. Prior to Freeman's testimony on the second day of trial, Wednesday, September 5, 2001, the judge gave Payton an opportunity to confer with Freeman. Freeman again refused to talk to Payton in private, telling him that he could ask him questions from the stand. Payton did so.

¶62.    Payton requested a continuance to investigate Freeman's allegations. The trial judge granted a fifteen-minute recess in order to allow Payton's attorney to confer with the State's investigator who interviewed Freeman. Afterwards, Payton requested and was supplied the investigator's notes from his meeting with Freeman. The record is silent as to whether Payton again requested a continuance after conferring with the investigator and reviewing his notes. These notes were used by Payton in cross-examination of Freeman.

¶63.    Payton asserts that the failure to grant a continuance was a violation of ***Box v. State***, 437 So. 2d 19 (Miss. 1983). He argues that a continuance was necessary because he needed to check the veracity of Freeman's testimony and prepare rebuttal testimony.

---

[8]The State did not address this issue in its brief.

¶64.   URCCC 9.04 (a)(1) requires the State to produce the name of witnesses it plans to call in its case-in-chief, along with the substance of any statements made by them.  Although the State produced Freeman's name prior to trial, it failed to produce the substance of his statement.  Thus, the State committed a discovery violation.

¶65.   In *Box*, and its progeny, this Court set out the procedure for trial courts to follow when a discovery violation has occurred.  This precedent has been codified in URCCC 9.04 (I), which reads, in pertinent part, as follows:

> If during the course of trial, the prosecution attempts to introduce evidence which has not been timely disclosed to the defense as required by these rules, and the defense objects to the introduction for that reason, the court shall act as follows:
> 1. Grant the defense a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs or other evidence; and
> 2. *If, after such opportunity*, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.
> 3. The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.
> The court shall follow the same procedure for violation of discovery by the defense.

URCCC 9.04.  (emphasis added).

¶66.   In ruling on Payton's directed verdict motion, the trial judge discussed the State's alleged discovery violation.  He concluded that because Payton had known since Friday, August 31, 2001, that Freeman was refusing to talk to him, he should have brought it to the court's attention before Freeman was called to testify on Wednesday, September 5, 2001.  The judge further reasoned that the motion should be denied because, if Freeman was telling the truth,

24

Payton surely knew what the substance of his testimony would be and should have anticipated it.

¶67. The trial court has considerable discretion in matters pertaining to discovery, and its exercise of discretion will not be set aside in the absence of an abuse of that discretion. *Gray v. State*, 799 So. 2d 53, 60 (Miss. 2001). The decision to grant or deny a motion for a continuance is within the sound discretion of the trial court and will not be grounds for reversal unless shown to have resulted in manifest injustice. *Hatcher v. Fleeman*, 617 So.2d 634, 639 (Miss. 1993). A violation of Rule 9.04 is considered harmless error unless it affirmatively appears from the entire record that the violation caused a miscarriage of justice. *Buckhalter v. State*, 480 So.2d 1128, 1128 (Miss. 1985); *Prewitt v. State*, 755 So.2d 537, 540-41 (Miss. Ct. App. 1999).

¶68. The failure to grant a continuance here was not an abuse of discretion. Payton was advised about the substance of Freeman's testimony during the argument on his motion for a continuance and through the notes from the State's interview with Payton. The testimony that Payton claimed he needed to investigate, whether there was a female guard at the bank and whether there was a car dealership in Carthage, concerned trivial matters of which Payton was partially already aware.[9] Therefore, Payton has failed to demonstrate that granting the

---

[9]Payton's co-defendants and Corey Young all testified that Payton had told them he had an inside source at the bank. Regarding the car dealership, Freeman testified that Payton told him he had gone to a "Tom Brooks dealership and pretended to be purchasing a car." He also responded affirmatively to the State's question that Payton had been "trying to purchase a car from somebody." Payton presented witnesses, Milton Banks and Joseph Langford, who testified that Payton had been to their respective homes inquiring about purchasing an automobile on the day of the robbery. Thus, although Freeman's testimony was factually different, its substance, that Payton sought to purchase a car the day of the robbery, was known by Payton.

continuance would have affected the outcome of his trial. Moreover, Payton could have been convicted even without Freeman's testimony. The additional evidence against Payton was substantial and adequately supported the verdict. Thus, error in failing to grant the continuance, if any, was harmless error.

¶69. This assignment is without merit.

### IV. WHETHER THE TRIAL JUDGE COMMITTED REVERSIBLE ERROR BY REFUSING TO RECUSE HIMSELF.

¶70. About half of Payton's brief raises various issues related to the propriety of the trial judge remaining on the case. For clarity, the issues have been combined and are discussed below.

¶71. Payton requested on several separate occasions that the trial judge, Circuit Judge Marcus D. Gordon, recuse himself. The judge denied the motion to recuse himself in each instance, save the final one.[10] Payton's basic argument is that he was denied a fair trial because of the trial judge's unreasonable animosity towards Payton's counsel and his vindictiveness toward Payton for having appealed and been granted a new trial.

¶72. These allegations carry a heavy burden of proof. A presumption of impartiality exists that a judge, sworn to administer impartial justice, is qualified and unbiased. *McBride v. Meridian Pub. Improvement Corp.*, 730 So.2d 548, 551 (Miss. 1998). This Court presumes that a trial judge is qualified and unbiased, and this presumption may only be overcome by

---

[10]After the trial, both circuit judges of Leake County recused themselves from hearing any post-trial motions brought by defense counsel Lumumba and requested this Court to appoint a special judge.

evidence which produces a reasonable doubt about the validity of the presumption. *Bredemeier v. Jackson*, 689 So.2d 770, 774 (Miss. 1997).

¶73. Under Canon 3 of the Code of Judicial Conduct, an appellate court uses an objective standard in deciding whether a judge should have disqualified himself from hearing a case. "A judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality." *Taylor v. State*, 789 So.2d 787, 797 (Miss. 2001). When a judge is not disqualified under the constitutional or statutory provisions, the decision is left up to each individual judge and is subject to review only in a case of manifest abuse of discretion. *Id.* at 797; *Buchanan v. Buchanan*, 587 So.2d 892, 895 (Miss. 1991).

¶74. When this Court is asked to review the denial of recusal, it "will look to the whole trial and pass upon questions on appeal in the light of the completed trial. Every act and movement had during the entire trial will be considered, and if we are unable to find that rulings have been prejudicial to the defendant, we will not reverse." *Brown v. State*, 829 So.2d 93, 99 (Miss. 2002) (quoting *Adams v. State*, 220 Miss. 812, 817, 72 So.2d 211, 213-14 (1954)).

¶75. With these principles as a guide, we proceed to address the issues raised by Payton.

**a.     Whether the evidence showed the court had an interest in the case.**

¶76. As in the first trial, co-defendant Graves testified that Payton was the mastermind behind the robbery. Graves further testified that after Payton's conviction in the first trial was reversed, Payton threatened his family if Graves did not change his testimony in order to help Payton. Graves claimed that Payton forced him to rewrite and sign a document that Payton had written. A portion of the document referred to the trial judge, claiming that he and the district

27

attorney were unfairly prosecuting Payton, who was innocent. On cross-examination, Payton used the document written by Graves to impeach his testimony that Payton planned and participated in the robbery.

¶77. On redirect, the State questioned Graves about the signed statement. The following exchange occurred:

> Q: Also, it says here that, "Judge Marcus Gordon stated during the taking of my plea, that he would uphold my sentence of thirty years until I came back to Court to testify against Henry Payton, and, if my testimony was not able to bring a conviction of Henry Payton, he would revoke my time given thereupon, take me to trial, and trying me for the maximum sentence." Did Judge Gordon ever do anything like that?
> A: No, sir.
> Q: Who told you to write that down?
> A: It was Henry.
> Q: All right. Did Judge Gordon do anything at all to make you do anything?
> A: No, sir.
> Q: Now, it says here. "This whole situation from beginning to end was orchestrated by Sheriff Jimmy Callahan, Ricky Lewis, District Attorney Ken Turner, and Judge Marcus Gordon to convict Henry Payton." Did I ever do anything to tell you that?
> A: No, sir.
> Q: Or did Judge Gordon?
> A: No, sir.

¶78. The State sought to introduce the document. Payton moved that it be excluded from evidence, or in the alternative, if admitted, that the portion about the judge be deleted. The judge admitted that the document in its entirety. Payton moved for a mistrial. The motion was overruled.

¶79. Payton argues that the judge erred by overruling his motion for a mistrial. He claims the document showed that the judge had an interest in the outcome of the trial. He argues that

"[t]he needless introduction of the statement necessitated the Judge's denial of its veracity. This denial was not forthcoming and denied Payton a fair trial."

¶80.    For support, Payton cites various rules and cases dealing with the disqualification and recusal of a trial judge when there are reasons to doubt his or her impartiality. He argues that Graves's admission that the portion of the document referring to Judge Gordon was false required the judge to deny that he threatened Graves with the maximum sentence if his testimony did not help to convict Payton.

¶81.    The standard of review for denial of a motion for mistrial is abuse of discretion. *Pulphus v. State*, 782 So.2d 1220, 1222 (Miss. 2001). Judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994). A trial judge enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses this discretion to the prejudice of the accused, the Court will not reverse this ruling. *Gilley v. State*, 748 So.2d 123, 126 (Miss. 1999).

¶82.    Miss. Code Ann. § 9-1-11 and the Mississippi Constitution of 1890 Article 6, Section 165 prohibit a judge from hearing a case in which he has an interest.[11] Miss. Code of Judicial Conduct Canon 3 C (1) (a) provides:

---

[11] Miss. Code Ann. § 9-1-11 (Rev. 2002): "The judge of a court shall not preside on the trial of any cause where the parties, or either of them, shall be connected with him by affinity or consanguinity, or where he may be interested in the same, or wherein he may have been of counsel, except by consent of the judge and of the parties."

Miss. Const. art. 6, §165 (1890): "No judge of any court shall preside on the trial of any cause, where the parties or either of them, shall be connected with him by affinity or consanguinity, or where he may be interested in the same, except by the consent of the judge and of the parties...."

> (1) a judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned including but not limited to instances where:
> (a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

In *Collins v. Dixie Transport, Inc.*, 543 So. 2d 160, 166 (Miss. 1989), this Court held that when examining the conduct of a judge the canons enjoy the same status as that of law.

¶83.    Payton argues that he took great pains not to ask Graves about those portions of the document that mentioned the judge because he felt they were not relevant and unduly prejudicial to a fair trial.  Payton claims he did not want to cause harm or delay to the proceedings or ill repute to the judge.

¶84.    If a party wishes to cross-examine a witness as to a prior out-of-court statement (usually made by the witness himself), he will not be permitted to pick out the part favorable to himself and leave it there. The opposing party is permitted to offer the entire statement into evidence in order to give the jury a complete picture. *Sanders v. State*, 237 Miss. 772, 115 So.2d 145 (1959); *Davis v. State*, 230 Miss. 183, 92 So.2d 359 (1957).

¶85.    M.R.E. 106 is a codification of this common law rule.  It states:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

The comment to Rule 106 states: "Such a rule attempts to prevent misleading the jury by taking evidence out of context."  However, rule 106 does not necessarily require that when a witness is questioned about a prior written or recorded statement that all the remainder must be offered into evidence, but only that part which "ought in fairness to be considered." *Welch v. State*, 566 So.2d 680, 690 (Miss.1990).

¶86.    Moreover, even if evidence is otherwise inadmissible, one party can open the door to its admission. *Crenshaw v. State*, 520 So. 2d 131, 133 (Miss. 1988); *Washington v. State*, 726 So. 2d at 216 ( Miss. Ct. App. 1998). We have previously said that "[i]f a defendant opens the door to line of testimony, ordinarily he may not complain about the prosecutor's decision to accept the benevolent invitation to cross the threshold." *Randall v. State*, 806 So.2d 185, 198 (Miss. 2001) (citing *Doby v. State*, 557 So.2d 533, 539 (Miss. 1990)). *See also Reddix v. State*, 381 So.2d 999, 1009 (Miss. 1980) ("If the defendant goes fishing in the state's waters, he must take such fish as he catches.").

¶87.    We conclude that the portion of the statement referring to Judge Gordon was needlessly admitted.  It did not help to explain the portion of the document which Payton questioned Graves upon and added nothing relevant to Graves's testimony.  However, Payton has failed to demonstrate that the introduction of the entire statement caused him prejudice.  He has not shown how the introduction of this statement adversely affected one of his substantial rights.

¶88.    Merely presenting a document which testimony revealed was inaccurate and written at the behest of Payton is insufficient to establish that the judge had an interest in the outcome. Payton does not explain what benefit, other than to disqualify the judge,[12] this testimony would have been to his case, or how he was prejudiced by its absence.  He simply argues that "the prejudice of the statement was patent on its face.  It showed the court had an interest in the

---

[12]*See* M.R.E. 605 (judge presiding at the trial may not testify in that trial as a witness).

outcome of the trial." Beyond these assertions, he offers no additional facts or legal authority for support.

¶89.    Supporting the argument of his issues with reasons and authorities is part of an appellant's burden on appeal. *Pate v. State*, 419 So.2d 1324, 1325-26 (Miss. 1982). Mere speculation is not sufficient to raise a reasonable doubt as to the validity of the presumption that the trial judge was qualified and unbiased. *Walls v. Spell*, 722 So.2d 566, 571-72 (Miss. 1998) (citing *Turner v. State*, 573 So.2d at 678). Payton has failed to meet his burden.

¶90.    This assignment is without merit.

> **b.     Whether the trial court harbored animosity toward Payton's counsel and was no longer impartial.**

¶91.    Payton argues that Judge Gordon should have recused himself because his agitation at Payton's counsel created an atmosphere of disadvantage to Payton and prejudiced the trial. He bases this conclusion on, inter alia, events which occurred on March 6, 2001, the third day of trial. The trial was to begin at 8:00 a.m. Payton's counsel was late, and Judge Gordon fined him $ 25. Payton argued that Judge Gordon had become so upset that he could not be objective. He argues that the judge had contempt for his counsel. He moved for the judge to recuse himself and for another judge to finish the trial. The motion was denied.

¶92.    Beyond the fact that the judge fined him $25, Payton points to the fact that the judge refused to wait five minutes to see what Payton's counsel's concerns were; that the judge denied him a sentencing hearing; sentenced him to a term that exceeded his life expectancy; and found his counsel "in contempt for an innocuous comment." This Court has adopted an objective standard for determining when a judge should recuse himself. A judge is required

to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality. *Hunter v. State*, 684 So. 2d 625, 630 (Miss. 1996). When a judge is not disqualified under the constitution or statute, the propriety of his or her sitting is a question to be decided by the judge and is subject to review only in cases of manifest abuse of discretion. *Id.* at 630. Payton has failed to demonstrate an abuse of discretion.

*Refusal to Grant a Recess*

¶93.    After the trial judge refused to grant Payton a five minute recess, Payton called his first witness. The State objected because the witness was not on the witness list. The trial judge, after ensuring that the witness did not object, granted the State an opportunity to interview the witness. Thus, Payton was afforded time during the State's interview to do that for which he requested the recess. Payton suffered no prejudice in the trial judge's failure to grant the recess. Without a showing of prejudice, no reversible error lies. *See Brown v. State*, 829 So.2d at 99.

*Failure to Grant a Sentencing Hearing*

¶94.    The failure to grant a sentencing hearing likewise does not establish sufficient prejudice to overcome the strong presumption of impartiality. A court rule provides that after a "defendant is adjudged guilty of the offense charged, sentence must be imposed without unreasonable delay." URCCC 11.01. Another rule states that "upon a finding of guilt, and where the court has discretion as to the sentence to be imposed, the court *may* direct that a presentence investigation and report be made." URCCC 11.02 (emphasis added). Presentence investigations are provided for in Miss. Code Ann. § 47-7-9(3) (a) (Supp. 2003), which indicates that a presentence investigation is required only where the trial court requests it.

*Roberson v. State*, 595 So.2d 1310, 1315 (Miss. 1992). In this case, Judge Gordon requested

and Payton submitted to such an investigation.

¶95.   URCCC 10.04 provides, in pertinent part, as follows:

> C.     Upon conviction, or after a plea of guilty, in cases where the court has
>        sentencing authority, there *may* be a hearing before the trial judge as
>        follows:
> 1.     A presentence investigation *may* be conducted . . . .

URCCC 10.04 (C) (1) (emphasis added). Thus, like the presentence investigation, the rules

clearly leave whether to have a sentencing hearing to the sound discretion of the trial judge.

Considering that the judge allowed a presentence investigation, we conclude that the failure

to provide a sentencing hearing was not done out of contempt for Payton or his counsel.

¶96.   This was a retrial before the same judge. The trial judge was therefore already privy to

the facts of the case and the aggravating and mitigating circumstances prior to sentencing.

Although the trial judge did not allow Payton to call witnesses and present evidence relevant

to sentencing, he did allow Payton to make relevant arguments. Payton addressed the court

regarding the law that applies when a defendant is sentenced a second time. He advised the

judge that Payton had colon cancer. He told the judge that Payton's life expectancy is in the

early sixties and advised him that the life expectancy for a black male is shorter than that of a

white male. Payton urged the judge to impose a term equal to the time he had already served.

¶97.   Payton alleges that at a sentencing hearing, he would have also presented evidence

regarding the false nature of co-defendant Graves's testimony. This testimony was cited by

the trial court as a major reason for enhancing Payton's sentence. Payton alleges that he "was

prepared to prove through the testimony of the notary public and other inmates at the

Wilkinson County Facility the spurious nature of Graves's testimony that Payton threaten[ed] his family if he did not make the statement." Payton also requested that jurors be polled to determine whether they found Graves's testimony to be credible if the judge was going to rely on Graves's testimony in sentencing. This request was apparently denied.

¶98. Beyond asserting that this evidence would have proved "the spurious nature of Graves' testimony", Payton does not identify what this testimony would have been. Without a proffer of what Payton's new evidence would have been, this Court cannot consider the appeal in an informed manner. *See Holland v. State*, 705 So.2d 307, 348 (Miss. 1997).

¶99. Payton's attacks on the veracity of Graves's testimony were questionable given Graves's overall unconvincing testimony at Payton's appeal-bond hearing. Also, during that hearing, Payton presented an inmate, Ernest Sykes, who testified that he was nearby when Graves wrote the statement exonerating Payton. Sykes testified that Payton was not present and that Graves told him that Payton was not involved in the robbery. This testimony contradicted that given by Graves during Payton's trial. It is also contrary to the inference that Payton was present since he signed the document as a witness. However, Payton's presentation of this evidence in the motion for a new trial does not demonstrate that the trial judge vindictively denied Payton a sentencing hearing. Payton presented no witnesses during trial to dispute Graves's testimony, thus, the trial judge should not be found in error for relying on his testimony. *See Boatner v. State*, 754 So.2d 1184, 1191-92 (Miss. 2000); *Mullins v. Ratcliff*, 515 So.2d 1183, 1189 (Miss. 1987).

¶100. In any event, had this evidence been presented it would have had no effect on the sentence imposed. It was not conclusive on the issue of whether Graves's testimony was false;

35

rather, it simply pitted his word against that of other inmates. Credibility is a question to be determined by the trier of fact, not this Court. The trial judge was apprised of sufficient evidence to support the sentence, and Payton has not sufficiently put forth any new evidence for this Court to consider.

¶101. This assignment is without merit.

> **c.** **Whether the trial court improperly enhanced Payton's sentence because he continued to assert his innocence and because the court was vindictive.**

¶102. Here, Payton argues that the trial judge was vindictive when he sentenced Payton to ten years for arson at the second trial after he had sentenced him to five years in the first trial. He argues that Judge Gordon punished him for refusing to admit his guilt and for successfully appealing his first convictions. This assertion is based in part on Judge Gordon's giving Payton an opportunity, prior to being sentenced, to admit his guilt. Payton maintained his innocence. He claims that the trial judge held that refusal against him.

¶103. Regarding Payton maintaining his innocence, Payton offers no citation to the record for where this claimed error occurs, and the only possible place this Court has found is located at page 678 of the trial record. We do not interpret the trial judge's comments there to demonstrate vindictiveness. The following dialog occurred:

> BY THE COURT:     Henry C. Payton, do you have anything to say?
> BY THE DEFENDANT:     The only thing I've got to say to Your Honor is that I'm not guilty. I didn't do it.

When sentencing Payton, the judge made the following comment:

> A moment ago, I gave you a chance to - - you have already had your trial by jury, you have your right of appeal, and, if you were guilty, I gave you a chance to say

36

as such, which would not affect your fight of appeal, but would have shown this Court some remorse. You declined to do so.

¶104. The State, relying on this Court's precedent, argues that remorse, or lack thereof, is an appropriate factor to consider in sentencing. Indeed, after stating that it is within the trial judge's discretion to consider things outside the trial record such as presentence investigations, this Court in *Ferrell v. State*, 810 So.2d 607, 612 (Miss. 2002), noted that the trial court considered that the defendant showed no remorse for his actions. This consideration was not held to be erroneous. *Id.* at 612. *See also Bell v. State*, 725 So. 2d 836, 852 (Miss. 1998).

¶105. At the second trial, there was evidence that Payton had a personal conversation with co-defendant, Cleon Graves, after the first trial and before the second. The evidence showed that Payton, by threatening violence upon Graves's family if he did not cooperate, forced Graves to write a statement that contained false facts supporting a finding that Payton was innocent.[13] Graves testified that the assertions in the statement were false and that he only made them out of fear for his family. The judge found that Payton attempted to change the testimony of a witness. He also found that Payton insinuated that he would commit some violent act if the witness did not help him. The trial judge then gave Payton a longer sentence for arson than he received at his first trial.

---

[13]As described above, this statement contained the following assertions: the Sheriff of Leake County wanted Payton behind bars and orchestrated the charges against Payton, along with Judge Gordon, Ricky Lewis, and the District Attorney. The statement also said that Judge Gordon told Graves that if his testimony at Payton's trial did not result in Payton's conviction he would see to it that Graves received the maximum sentence.

¶106. The court is to consider all relevant factors when making a sentencing decision. *Stewart v. State*, 372 So.2d 257, 259 (Miss. 1979). Where the sentence imposed is within the range permitted by statute, this Court generally has no power to disturb the trial court's exercise of discretion. *Davis v. State*, 724 So.2d 342, 344 (Miss. 1998). There is no absolute constitutional bar to sentence enhancement at a second trial. *Colten v. Kentucky*, 407 U.S. 104, 117, 92 S.Ct. 1953, 1960-61, 32 L.Ed.2d 584, 594 (1972); *Jones v. City of Meridian,* 552 So.2d 820, 826 (Miss. 1989). To determine if a harsher sentence has been imposed due to vindictiveness, we have outlined the following considerations:

> 1. The imposition of a harsher sentence by a judge following a new trial and conviction for the same charge is not violative of the federal, or Mississippi's Constitution.
> 2. Due process of law does require that vindictiveness against a defendant for having successfully attacked his first conviction play no part in the sentence he receives after a new trial.
> 3. Due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge.
> 4. In order to assure that it may be determined on appeal whether such a motive was absent the following must occur:
> a. The judge must affirmatively state in the record his reasons for the harsher sentence.
> b. The reasons must be based upon objective information concerning identifiable conduct on the part of the defendant which occurred after the time of the original sentencing proceedings, or based upon objective information concerning events which occurred after the time of the original sentencing proceeding that may have thrown new light upon the defendant's life, health, habits, conduct or mental and moral propensities.
> c. The factual data upon which the increased sentence is based must be made a part of the record.
> d. This information and data upon which the judge bases his sentence may come to the judge's attention from evidence adduced at the second trial itself, from a new presentencing investigation, from the defendant's prison record, or possibly from other sources.

*Ferrell v. State*, 810 So.2d at 611-12 (citing *Ross v. State*, 480 So.2d 1157, 1160-61 (Miss. 1986)).

¶107. In this case, the trial court reviewed on the record the reasons for imposing the maximum available sentence. Prominent among those reasons was the fact that Payton sought to force Cleon Graves through threats of violence to change his testimony and that the robbery, arson, and kidnaping were planned and set into motion by Payton. The trial judge also considered Freeman's testimony that Payton got him to ask his co-defendants to change their testimony to exonerate Payton. The court specifically considered Payton's age, but the judge found the aggravating factors to outweigh Payton's age.

¶108. In spite of Payton's claim that he was punished with the maximum sentence only because he successfully appealed his first conviction and refused to admit his guilt, we conclude that the record clearly reflects that the trial court's basis for imposing the maximum sentences was the gravity of the offenses, Payton's lack of remorse, and testimony that Payton attempted to coerce his co-defendants to change their testimony. The judge's enhancement of Payton's sentence was not an abuse of discretion and is therefore affirmed.

¶109. This assignment is without merit.

> **d.      Whether the trial court erred in sentencing Payton to a term of years that is not reasonably expected to be less than his life expectancy.**

¶110. Payton argues that the trial judge erred when he sentenced him to a term of years that was not reasonably expected to be less than his life expectancy. Payton was convicted of violating Miss. Code Ann. § 97-3-79, which states:

39

> Every person who shall feloniously take or attempt to take from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of robbery and, upon conviction, shall be imprisoned for life in the state penitentiary if the penalty is so fixed by the jury; and in cases where the jury fails to fix the penalty at imprisonment for life in the state penitentiary the court shall fix the penalty at imprisonment in the state penitentiary for any term not less than three (3) years.

Miss. Code Ann. § 97-3-79 (Rev. 2000). The jury in the case at bar failed to sentence Payton to life imprisonment, thus, as authorized by the statute, the trial judge sentenced him. This Court has held that, where a statute authorizes the jury to impose life imprisonment and the jury fails to so impose, the judge must sentence the defendant to a definite term reasonably expected to be less than life. *Stewart v. State*, 372 So. 2d at 258. The sentence imposed in the case at bar was 38 years in the custody of the Mississippi Department of Corrections.

¶111. Payton was born March 30, 1958. He was forty-three years old at the time of sentencing. The mortality tables that the trial judge used indicated that a forty-three year old male has a life expect of 39.6 years. Finding Payton's life expectancy to be 39.6 years, the judge sentenced Payton to serve a term of thirty-eight years for the armed robbery: one and a half years less than his life expectancy. If Payton serves one-hundred percent of his sentence for armed robbery, he would be complete his sentence for the armed robbery conviction at age 81. He would still have ten years to serve for arson (minus time served). ¶112.      The trial judge  recognized and apparently relied on precedents of this Court in sentencing Payton. Indeed, we have upheld sentences that neared what could be considered life sentences while taking into account the defendant's life expectancy. *Ware v. State*, 410 So.2d 1330, 1332 (Miss. 1982); *Wilson v. State*, 390 So.2d 575, 580 (Miss. 1980). Age and life expectancy are

40

but parts of the total considerations in proper sentencing. *Lindsay v. State*, 720 So.2d 182, 186 (Miss. 1998).

¶113. In *Ware* the defendant was given a 40-year-sentence when he had an actuarial life expectancy of 40.51 years. *Ware*, 410 So.2d at 1332. Though the sentence neared the defendant's life expectancy, this Court found that the evidence indicated that the defendant should receive every year possible. *Id.* at 1332.

¶114. In *Wilson*, the defendant was given a 20-year sentence when his life expectancy was 22 years. *Wilson*, 390 So.2d at 580. The *Wilson* case made reference to *Stewart*, in that the Court considered other pertinent facts which led the judge to decide that the defendant deserved a harsh sentence. Though the sentence neared a life sentence, the defendant showed little remorse for what he had done, and he had not helped the police to catch his accomplices. Because of this, his life expectancy was not given as much weight as the other pertinent facts.

¶115. However, in its brief, the State agrees with Payton's contention that his life expectancy is not 39.6 years. According to the state, the life expectancy for a forty-three year old black male is 30.6 years. Thus the State confesses this issue.

¶116. A separate 10-year sentence for arson is immaterial when determining the length of the sentence for armed robbery. This would encourage the commission of other felonies during the course of a crime such as this. If this Court did as Payton argues, there would frequently be little or no additional penalty the trial court could impose without a jury sentence of life imprisonment. The fact that Payton engaged in other misconduct, i.e., the separate felony of arson, should not gain him a lighter overall sentence as determined by the learned trial judge.

The issue before the Court is not whether the sum of sentences for Payton's various crimes exceeds his life expectancy. Instead, the statute and our precedent case law focus on whether the sentence of the particular crime exceeds Payton's life expectancy.

¶117. There is nothing in Payton's brief or argument which would overcome the strong presumption that the trial judge here was fair and unbiased. In light of the mortality information provided by the State and the confession of this issue by the State, this case is remanded to the trial court for resentencing of the armed robbery consistent with a life expectancy of 30.6 years.

> e.     **Whether the trial judge committed reversible error in overruling Payton's motion of recusal on post-conviction motions.**

¶118. At a post-conviction motion hearing, Payton again moved for the judge to recuse himself. The motion was denied. Payton argues this denial was reversible error. He reasserts his previous arguments: (a) the fact that Payton was denied a sentencing hearing which would have provided evidence of his life expectancy and the fabricated nature of Cleon Graves's testimony the court cited to justify Payton's increased sentence; (b) the court based its sentence in part on the testimony of Eric Freeman. The required continuance would have shown the testimony to be untenable; and (c) Payton was sentenced to a term of years greater than his life expectancy because he failed to tell the court he was guilty. Payton also claimed that the judge displayed a deep animosity toward his counsel and vindictiveness toward Payton.

¶119. The record reveals that during the hearing on Payton's motion for a new trial, Payton's counsel, Chokwe Lumumba, was fined $500 and sentenced to three days in jail for contempt of court. Attorney Lumumba characterizes what occurred as an "innocuous comment".

However, this Court disagrees. Attorney Lumumba was extremely disrespectful to the judge. After the motion for a new trial was denied, Lumumba attempted to offer the judge advice on how "to get along better with other lawyers in the future." The judge ordered him removed, and Lumumba stated "your henchmen throw me out, Judge?" Lumumba told the judge, "I'm proud to be thrown out of your courtroom." The judge fined him $300. After he was fined, Lumumba stated, "Look, Judge, if we've got to pay for justice around here, I will pay for justice....I've paid other judges to try to get justice, pay you, too, if that's what is necessary." Following this comment, the judge fined him $500, sentenced him to three days in jail, and later reported him to the Mississippi Bar. Payton argues that, based upon these facts, a reasonable person would harbor doubts about the judge's impartiality.

¶120. A judge should recuse himself if a reasonable person, knowing all the circumstances, would harbor doubts about the judge's impartiality. *Green v. State*, 631 So. 2d 167, 177 (Miss. 1994). A presumption exists that the judge is qualified and unbiased. To overcome that presumption the evidence must produce a reasonable doubt about the validity of the presumption. *Id.* Occasional displays of irritation, usually regretted as soon as made, does not suffice to show personal bias or prejudice, whether the irritation was justified or not. *See Walker v. Bishop*, 408 F.2d 1378, 1381 (8th Cir. 1969); *Rosen v. Sugarman*, 357 F.2d 794, 798 (2d Cir. 1966).

¶121. The trial judge had already ruled upon Payton's motion for a new trial at the time the spectacle described above occurred. Following that incident, the judge voluntarily recused himself from hearing motions later brought by Payton's regarding his appeal. All of the other events complained of by Payton have been addressed elsewhere in this opinion and found

43

lacking in merit. After a thorough review of the record, this Court concludes that any personal feelings the trial judge may have had about Payton's counsel did not improperly influence his trial decisions. He presided over the trial with dignity and treated both parties equally in his rulings. He did this in the face of rude, disrespectful behavior exhibited by Payton's counsel throughout the trial.

¶122. Payton has failed to present evidence sufficient to overcome the presumption that the judge was impartial while presiding over Payton's case. He has not shown that the sanctions his counsel received were unwarranted. He also has not proved that a reasonable person, knowing all the facts, would harbor doubts about the trial judge's impartiality. Therefore, he has not met his heavy burden, and this assignment is without merit.

### V. WHETHER THE COURT ERRED IN NOT HEARING TESTIMONY FROM JURORS WHO PROVIDED AFFIDAVITS ABOUT MATTERS OUTSIDE JURY DELIBERATION THAT AFFECTED THEIR VERDICT.

¶123. During the hearing on Payton's motion for a new trial, Payton argued for the admissibility of the affidavits and testimony of two jurors.[14] Payton claimed this evidence would show that the jurors knew the witness Britt would not lie and that they failed to admit to knowing him during voir dire. Additionally, Payton claims jurors would have testified that they believed they would not be allowed to leave without returning a unanimous verdict. Payton claims this evidence was admissible because it did not impeach the jury verdict or concern matters or statements made during jury deliberations. He argues that the evidence was

---

[14]In his brief, Payton says these affidavits were of jurors Melba Jones and Betty Newcome. For these affidavits, Payton cites the Court to his record excerpts at pages 242 and 244. However, these pages contain the affidavits of jurors Stanley Rushing and Johnnie Langdon, respectively. The record contains no affidavits of Melba Jones and Betty Newcome.

offered to show what happened or did not happen during voir dire and why he was denied a fair trial. He also claims it would have revealed outside influence that affected the verdict.

¶124. In response, the State argues that Payton's proposed evidence relates to individual juror misconduct and not to any outside influences. It cites various cases which hold that such evidence, being personal to the jurors, is inadmissible to impeach their verdict. Thus, it argues, the trial judge was correct in excluding the evidence. This Court agrees.

*Payton's proposed testimony regarding juror misconduct*

¶125. In one of the affidavits Payton sought to introduce, Juror Langdon avers the following: "several jurors indicated that they knew Mr. Britt . . . .[these jurors] indicated that Mr. Britt would not *be* with respect to his testimony concerning the robbers using the name Henry." (emphasis added). Payton argues this affidavit establishes that the jurors thought Britt would not lie.[15] Langdon said that these jurors indicated during deliberations that they knew Britt when asked about it during voir dire, but failed to so acknowledge.

¶126. During voir dire, juror Melba Jones did state that she knew Britt and all the tellers at the bank. Jones said that she knew that Britt was the one who was kidnaped. She said that knowing the tellers and Britt would not affect her if she sat on the jury.[16]

¶127. Payton claims that another juror, Sarah Annie May, would have testified that she knew the witness, Freeman, from working with him at a chicken factory. The jury panel was asked

---

[15]We assume the "be" in the above quote is a typo and should read "lie."

[16]Britt was the President of the Bank. He testified that the robbers used the name "Henry" while inside the bank and during the police chase, cursing "Henry" for abandoning them. Payton's first name is Henry.

if they knew Freeman during voir dire. May did not indicate that she did. Payton has not submitted an affidavit from May.

¶128. Payton claims that a juror named Ms. White or Ms. Horn failed to reveal during voir dire that her mother worked at the jail and saw Payton and knew he was serving time on this case prior to trial. Payton points out that he asked if anyone was familiar with any other proceedings before trial and no one responded that they did. Payton has not submitted an affidavit from this juror.

¶129. Payton also argues that a juror, who was a fireman, informed other jurors, not during juror deliberation, that Payton had previously been convicted of arson and was serving time for that conviction. Payton argues that this juror was encouraging other jurors to vote guilty on the arson count because Payton would not have that much time to serve anyway. Payton claims that is in fact what one of the jurors did.        Payton has not submitted any affidavit to this effect.

¶130. The judge found that, regarding the outside influences, the county was rural, and it was not unusual for potential jurors to know parties and witnesses in trials. The judge further found that he and both counsel for the State and for the defense asked the potential jurors if they knew the various parties and witnesses. Several responded that they did. The judge then asked those who responded if their familiarity would have any influence on their decision. Both counsel then questioned the jurors about that issue and all the jurors questioned stated that their familiarity with witnesses or parties would not affect their ability to be impartial. The judge excluded both affidavits and all testimony from the jurors.

¶131. A prospective juror's failure to respond to questions during voir dire does not warrant this Court granting a defendant/appellant a new trial unless the question propounded to the

46

juror was (1) relevant to the voir dire examination; (2) ... unambiguous; ... (3) ... the juror had substantial knowledge of the information sought to be elicited ... [and (4) ] prejudice ... in selecting the jury could reasonably be inferred from the juror's failure to respond. *Chase v. State*, 645 So.2d 829, 847 (Miss. 1994); *Myers v. State*, 565 So.2d 554, 558 (Miss.1990); *Odom v. State*, 355 So.2d 1381, 1383 (Miss. 1978).

¶132. Assuming that the first three elements were met, Payton has not shown that he was prejudiced by the jurors' failure to respond during voir dire. Moreover, even if the jurors had revealed the information during voir dire, Payton would not necessarily have been entitled to a challenge for cause. This crime occurred in a rural community and had received a lot of publicity, finding jurors with no knowledge of the case or the parties would have been difficult. Moreover, the jurors were asked if they knew any of the witnesses, and several responded that they did. Those jurors assured the court and the attorneys that their familiarity with the witnesses would not influence their ability to be fair and impartial.

¶133. Jurors generally may not impeach their own verdict by testifying about motives or influences affecting deliberations. However, jurors may testify about misconduct in their presence or about outside influences on the jury panel. *Fairman v. State*, 513 So.2d 910, 915-16 (Miss. 1987). *See also* M.R.E. 606(b) (juror can only testify "on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror"). Further, M.R.E. 606(b) prevents a juror's affidavit or any evidence of a statement made by a juror concerning the jury's deliberation from being received into evidence. *APAC-Miss., Inc. v. Goodman*, 803 So.2d 1177, 1186 (Miss. 2002). In the course of post-trial hearings, juror testimony is only

47

admissible as to *objective facts* bearing on *extraneous influences* on the deliberation process. *Gladney v. Clarksdale Beverage Co.*, 625 So. 2d 407, 419 (Miss. 1993).

¶134. All of Payton's proposed evidence relates to things that some jurors told other jurors during the deliberative process. This alleged information came from the jurors' own knowledge of the facts and witnesses. It in no way relates to extraneous information supplied from outside the jury room. The only allegations before the trial court were that the jurors themselves discussed matters outside the evidence at trial. There was no evidence that someone outside the twelve jurors did something to influence their deliberations.

¶135. Jurors cannot impeach their duly rendered verdict. Their affidavits introduced for such purpose will be disregarded. *Index Drilling Co. v. Williams*, 242 Miss. 775, 789, 137 So.2d 525, 530 (1962). In the absence of a threshold showing of external influences, an inquiry into the juror verdict is not required. *Gladney v. Clarksdale Beverage Co.*, 625 So.2d at 419. Payton has made no such showing. Thus, this evidence cannot now be used to impeach the jury's verdict. It was within the trial judge's discretion as to whether the jurors' behavior warranted a new trial. *Myers*, 565 So.2d at 558-59. Payton has failed to demonstrate an abuse of that discretion. Public policy requires a finality to litigation. *Martin v. State*, 732 So.2d 847, 852 (Miss. 1998).

*Payton's proposed evidence regarding juror confusion*[17]

¶136. Payton argues that the jurors concluded from the judge's instructions that he would only accept a unanimous verdict. Payton argues that the juror testimony was necessary "for the

---

[17]The State does not address this issue in its brief.

court to determine whether its jury instructions were clear enough not to have confused the jury or were in the juror's mind contradictory to other instructions which were previously given. . . . [t]hese jurors compromised their honest beliefs of whether Payton was guilty or not to reach a unanimous verdict."

¶137. Payton points to the affidavits of Jurors Rushing and Langdon. In their affidavits, these jurors said that they do not believe the State proved Payton guilty beyond a reasonable doubt. They aver that they voted guilty only because they believed that they had to return a unanimous verdict on each count. They point to an inquiry the jury made to the judge after being deadlocked. They asked the judge if they had to return a unanimous verdict on all counts. The judge responded as follows:

> You are required, before the Court can accept a verdict, it must be agreed to by all twelve jurors, whether that verdict is guilty or not guilty. There are three charges in the indictment, and you must make separate unanimous verdicts regarding all three counts.
> You **are** [18] required to find the Defendant guilty or not guilty in all three counts, but you must make a separate finding on each count. Refer to Instruction S-2. Continue with your deliberations.

(emphasis added). Instruction S-2 read as follows:

> The Court instructs the Jury that the Defendant, Henry C. Payton, has been charged in a Three Count Indictment and in your deliberations you should deliberate on each count separately and return separate verdicts for each count.

---

[18] The trial judge orally dictated this instruction. What he said differs in a substantial way from what was actually transcribed and sent to the jury. The trial judge stated, "You are **not** required to find the Defendant guilty or not guilty in all three counts, but, you must make a separate finding on each count." (emphasis added). As noted above, the instruction sent to the jury read as follows: "You **are** required to find the Defendant guilty or not guilty in all three counts, but you must make a separate finding on each count." (emphasis added). Payton did not point out this inconsistency at trial or in his brief.

Payton argued that the trial judge put too much emphasis on the requirement of unanimity and should also have instructed the jury to let the court know if they were deadlocked. Payton urges the same argument here.

¶138. The guideline to follow when a jury has a question about a case on which it is deliberating is enunciated in *Girton v. State*, 446 So.2d 570, 572 (Miss. 1984). "Our first recommendation is that the circuit judge determine whether it is necessary to give any further instruction. Unless it is necessary to give another instruction for clarity or to cover an omission, it is necessary that no further instruction be given. Of course, a circuit judge may realize such a necessity even in the absence of an inquiry from the jury, and under such circumstances quite properly may give the jury additional written instructions." *Id.* (citations omitted).

¶139. Rule 3.10 of the Uniform Rules of Circuit and County Court Practice states in pertinent part, as follows:

> If the jury, after they retire for deliberations, desires to be informed of any point of law, the court shall instruct the jury to reduce its question to writing and the court in its discretion, after affording the parties an opportunity to state their objections or assent, may grant additional written instructions in response to the jury's request.
> If it appears to the court that the jury has been unable to agree, the court may require the jury to continue their deliberations and may give an appropriate instruction.

URCCC 3.10. It is obvious that, for whatever reason, the jury in the case at bar was confused about the voting process. Likewise obvious is that this confusion was not alleviated by reference to the initial jury instructions. Therefore, based upon the plain language of Rule 3.10 and the precedent cited above, there is no doubt that the trial court had the authority to

50

give supplemental instructions to the jury. The question then remains whether the instructions given by the trial court in this case were proper.

¶140. In determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. *Coleman v. State*, 697 So. 2d at 782. If the instructions, when so read, fairly announce the law of the case and create no injustice, no reversible error will be found. *Id.* We presume that the jury follows the instructions of the trial court. *McCollum v. State*, 785 So.2d 279, 283-84 (Miss. 2001) (citing *Johnson v. State*, 475 So.2d 1136, 1142 (Miss. 1985)). This Court sees no reason to conclude that the jury did otherwise in this case.

¶141. The jury was fairly and fully appraised of the applicable law, both through the judge's instructions and through Payton's counsel's admonitions to them during voir dire and closing argument. During voir dire, counsel for Payton asked the potential venire if they knew that in order to bring back a verdict it would have to be unanimous. He also asked them if they understood they had to vote their conscience. He stated that it did not matter if it took the next two years. He told them that they did not have to change their minds, opinions, or votes because of what someone else wanted them to do or just for the purpose of reaching a verdict. Payton's counsel asked the jurors if they understood that if they could not reach a verdict because they could not agree they could send a letter to the judge telling him that. Additionally, three instructions informed the jury that they were not to surrender their honest convictions and beliefs merely, inter alia, to save time or to prevent a mistrial.

¶142. Where, as here, the jury was apparently at a loss as to how it should proceed, this Court sees no reason why we should discourage trial judges from providing supplementary guidance.

51

Although the trial judge's instruction to the jury in this case was perhaps erroneous, it was harmless because the jury had been fully apprised of the correct law on several prior occasions. In addition, the jurors' misconceptions regarding the voting process is a matter personal to those jurors and therefore improper evidence to impeach their verdict. *See Gladney v. Clarksdale Beverage Co.*, 625 So. 2d at 419 (holding juror testimony only admissible as to objective facts bearing on extraneous influences on the deliberation process).

¶143. Considering the public policy in favor of unanimity and against mistrials, and also considering that the jury was polled following their verdict and none of them stated that they only voted guilty so they could go home, this Court concludes that any error in the judge's supplemental instruction is insufficient to warrant reversal.

## CONCLUSION

¶144. Finding no reversible error in Payton's convictions and sentence for his arson conviction, we affirm the trial court's judgment to that extent. We reverse Payton's sentence for his armed robbery conviction of thirty-eight years in the custody of the Mississippi Department of Corrections, and we remand this case to the trial court for resentencing on the armed robbery conviction consistent with Payton's life expectancy of 30.6 years.

¶145. **COUNT I: CONVICTION OF ARMED ROBBERY, AFFIRMED. REVERSED AND REMANDED FOR RESENTENCING ON THE ARMED ROBBERY CONVICTION. COUNT III: CONVICTION OF ARSON (SECOND DEGREE) AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCE IN COUNT III SHALL RUN CONSECUTIVELY TO THE SENTENCE IMPOSED UPON THE APPELLANT IN COUNT I WHEN HE HAS BEEN RESENTENCED.**

**PITTMAN, C.J., WALLER, COBB, EASLEY, CARLSON AND GRAVES, JJ., CONCUR. McRAE, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**

**McRAE, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶146. While I commend the majority for recognizing the need to remand this case for resentencing, I find fault with the remainder of its opinion as it has seen fit not only to undermine a defendant's presumption of innocence, but also to weaken a defendant's right against self-incrimination. Accordingly, I dissent.

> **I.    Whether Payton was denied a fair trial because he was brought into the courtroom where the jury was seated wearing shackles and chains.**

¶147. While it is apparent from the record and briefs that Payton has failed to provide evidence that any juror noticed that he was chained and shackled, it is equally apparent that the majority has failed in its duty to safeguard one of the cornerstones of American criminal jurisprudence - the presumption of innocence.

¶148. It is true that the defendant should first have to make a showing that he was restrained and that the jury did notice that the defendant was improperly restrained. See *Brown v. State*, 690 So.2d 276, 287 (Miss. 1996). In this case, Payton has failed to offer any proof that a single juror noticed the improper restraints that were placed upon him. Therefore, he cannot succeed on this issue. However, the opinion of the majority warrants further discussion.

¶149. The first error occurs in the majority's statement of the standard of review. While correct as to the standards for failure to grant a continuance or to quash a venire, I object to the statement that the majority cites from *Burrell v. State,* 613 So.2d 1186, 1190 (Miss. 1993) as representing the standard for reviewing arguments as to fairness and impartiality at

53

trial. If the majority had quoted the entire sentence from ***Burrell***, we would see that the statement concerned to a change of venue, which is not argued in this case. See *id.*

¶150. This apparently new standard of review has not appeared in any of the past cases dealing with shackling. Instead, the standards for analyzing this problem have been well articulated for many years. See ***Hickson v. State***, 472 So.2d 379, 383 (Miss. 1985). This Court has held that the trial court is vested with the discretion to determine whether a defendant should be restrained based on reasons that will be articulated below. Notwithstanding "if the right of the accused is violated, it may be ground for the reversal of a judgment of conviction." ***Id.*** (quoting ***Rush v. State***, 301 So.2d 299, 300 (Miss. 1974)). Thus, the Court has taken notice that a defendant may be restrained at the choice of a party besides the trial judge (i.e. prosecution, law enforcement) and that those decisions made by parties other than the trial judge are entitled to no deference.

¶151. Again, the law regarding the restraint of a defendant is quite clear. A defendant has a common law right to be free from restraints in the presence of the jury, but may be so restrained when necessary for the protection of the court or the prevention of an escape. ***Id.*** It is also true that a merely technical violation of this rule is not grounds for reversal. ***Id.*** The majority cites these rules, but then sees fit to misapply them in a manner that places an unfair burden upon a defendant.

¶152. I agree that a defendant must first show that he was restrained and that such restraints were noticed by the jury. However, this is the only burden that should be placed on the defendant. While M.R.E. 606(b) would allow a defendant to offer juror testimony that restraints were noticed, it prevents a juror from testifying as to what effect that such an event

would have on his decision individually or the jury's as a whole. See M.R.E. 606(b) (2003)[19].

Thus, the rules of evidence prevent the defendant from proving prejudice subjectively.

¶153. Therefore, once the defendant has shown that he was restrained and the jury noticed his restraints, the court should perform an objective test to determine prejudice. Such a test is laid out by the Tenth Circuit which has held that the court must ask "whether there exists a reasonable possibility that the external influence or information affected the verdict." *United States v. Simpson*, 950 F.2d 1519, 1522 (10th Cir. 1991) (citing *Paz v. United States*, 462 F.2d 740, 746 (5th Cir. 1972)).

¶154. It is within the context of such analysis that the court should consider arguments put forth by the State, i.e. there was only a technical violation. However, the State should be forced to put forth and prove such assertions. The Court should not, however, as it has done here, accept by default that such an occurrence was an oversight without any showing by the State other than a recitation of the legal rule.[20]

¶155. Of course, if the judge were to find that the restraints were necessary to ensure the safety of the court, the need to perform this test would be obviated. However, to ensure that such is not merely used as an excuse, such a determination should be made before the fact, not after.

---

[19] "Upon inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent or dissent from the verdict or indictment or concerning his mental processes therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."

[20] Such is especially true here, where such an argument was never put forth at trial, but only on direct appeal.

¶156. Of course, a technical violation of the rule against shackling may not be grounds for reversal. However, I think that we have long since passed the day where law enforcement officials and/or the prosecution should be able to claim mere oversight as a defense to improperly restraining a defendant in the presence of a jury. Perhaps there was a need for such a defense when this rule was first announce in this state with *Rush* in 1974. However, almost 30 years and many cases later, our judicial patience should be worn thin with such an excuse. Indeed, in a day and age where officers are trained to read *Miranda* warnings with every arrest, there seems no hardship with requiring officers to remove a defendant's restraints before he enters a courtroom. To allow law enforcement and prosecutors to simply say "Oops, we forgot!" after 30 years of notice shows what little regard this Court has for the necessity to protect a defendant's presumption of innocence.

¶157. However, such a test as outlined above would adequately protect the rights of the accused, yet not negate the hard work of our trial courts and law enforcement officers based on a merely technical violation of the rule against improper restraints. Notwithstanding, in the case at bar, the majority has apparently placed all of the burden on the defendant in a manner that undermines the presumption of innocence.[21] While the defendant has failed in his burden as to this issue, I find the majority's analysis unacceptable and, therefore, dissent.

---

[21] The majority's application of the law to the facts in this case is also erroneous. It states that "[t]his case is more akin to the non-prejudicial technical violation found in *Rush* than it is to the more egregious version found in *Hickson*." However, the only facts stated in Rush were that a Deputy brought the defendant into the courtroom in shackles. See *Rush*, 301 So.2d at 300. While the Court stated that there was no resulting prejudice, there was no mention of whether jurors saw the defendant shackled, whether it was a technical violation, or whether security necessitated the restraints. *Id.* Therefore, finding the facts of this case similar to those in *Rush* is misguided.

## II. Whether the trial court erred in permitting the introduction of Payton's statement when he had been denied his Miranda warnings.

¶158. While this Court has held several times that there is no requirement that a defendant's confession be written and signed, to properly ensure a citizen's right against self-incrimination, we must offer some sort of protection to the accused. Certainly in today's age when the technology is so inexpensive and readily available, law enforcement officials should be required to produce some type of video or audio recording of an in-house interrogation.

¶159. In *Taylor v. State*, 789 So.2d 787, 793 (Miss. 2001), I concurred with an opinion where this Court held that it was not necessary to have a written and signed confession. However, in that case, law enforcement officials videotaped the interrogation, thus creating an independent source to verify the voluntariness of the confession. See *Id.* at 795-96.

¶160. The right against self-incrimination, much like the presumption of innocence is an essential component to the American system of criminal justice. Requiring an audio or video recording of an in-house interrogation would be such a small cost for an enormous benefit.

## III. Whether the trial court committed reversible error when it denied Payton's motion for a directed verdict or in the alternative a mistrial.

¶161. I also dissent to the finding of the majority as to the testimony of Eric Freeman. The majority states that it was Freeman's testimony that the alleged conversation occurred within the past month. However, on cross, Ragsdale clearly stated that Payton had not been allowed to go out to recreation with anybody "for the last couple - - maybe a month or a little bit more." Based on the facts recited by the majority and the testimony of Ragsdale, this conversation could never have taken place in the time frame alleged by Freeman. Thus, Freeman did not have

the necessary personal knowledge to render him competent to testify as a disinterested witness.  See M.R.E. 601, 602.

¶162.  I find it disconcerting that the majority has failed in its duties to protect the few rights that a defendant maintains under our criminal justice system.  Therefore, aside for the decision to remand for resentencing, I dissent to the opinion of the majority.